# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re:<br><br>BNX SYSTEMS CORPORATION,<br><br>　　　Debtor. | Case No. 05-15902-RGM<br>(Chapter 11) |
| BNX SYSTEMS CORPORATION,<br><br>　　　Plaintiff,<br><br>vs.<br><br>WORLDWIDE INVESTIGATIONS &<br>RESEARCH, INC., et al.,<br><br>　　　Defendant. | Adv. Proc. No. 06-1141 |

## MEMORANDUM OPINION

AT TRIAL, the court found that John Nardolilli interfered with an auction of BNX's assets in this court to be held pursuant to § 363 of the Bankruptcy Code. Nardolilli did so by clouding title to the assets to be sold through an assertion of false claims. As a result, the court found Nardolilli liable for intentional interference with business expectancy and abuse of the process of this court. The remaining issue is the extent of damages to be awarded.[1]

Both parties agree that the proper measure of damages is the difference between what the assets should have sold for and what they did sell for; the attorneys' fees that were required by BNX to defend against the false claims that were the heart of abuse of process of this court; and the delay

---

[1] While these are two separate torts—the interference with business expectation need not be accomplished by an abuse of this court's process—in this case, the interference was caused, in part, by the abuse of the process. Notwithstanding that Nardolilli committed two torts, BNX is entitled to a single recovery. The amount of damages caused by each tort is the same.

costs. BNX also asks for punitive damages.

Nardolilli argues that the stalking horse bid by Aladdin of $750,000.00 is the proper place to begin. The final bid after Nardolilli's false claims were revealed, adjudicated, and removed as a consideration was CitiBank's bid of $2.2 million. Thus, Nardolilli argues, his conduct, although tortious, benefitted BNX by increasing the ultimate sales price from $750,000.00 to $2.2 million, an increase of $1.45 million. Even considering the attorneys' fee incurred by BNX in defending against the false claims of $98,329.00 and the delay costs of $125,628.00, Nardolilli asserts that the actual damages are less than the benefit caused by the delay.

The court does not agree with Nardolilli. The issue is what the sales price of the BNX assets would have been had Nardolilli not wrongly interfered with the auction process. The starting point for calculating damages is what the final bid would have been but for Nardolilli's interference with the process, not, as Nardolilli suggests, the amount of Aladdin's initial bid which was tainted by the interference.

Nardolilli looks to the bid deadline and argues that since no other bidder qualified within the deadline, Aladdin's bid of $750,000.00 would have been the final bid. This overlooks Nardolilli's own tortious conduct, which chilled the bidding. A prospective purchaser was interested in buying BNX's assets, not a lawsuit that it must later have paid to litigate and risked losing. The reason there were no other bidders by the initial bid deadline was because of Nardolilli's tortious conduct. This is easily confirmed by the outcome of the rescheduled sale. This sale is persuasive because it was reasonably close in time to the initially scheduled sale date and reflected conditions much closer to those that would have prevailed in the initially scheduled auction had Nardolilli not tainted that sale. There was competitive bidding between CitiBank and Aladdin until the bid price reached $2.2

million, at which time Aladdin dropped out. This is the auction that should have occurred and would have occurred had Nardolilli not tortiously interfered with the auction process initially. Having chilled the bidding at the initial auction, Nardolilli cannot now benefit from his wrongful conduct.

BNX, on the other hand, asserts that had Nardolilli not initially interfered with the auction process by filing his false claims with the bankruptcy court and fully litigating them, there would have been more time for the assets to have been marketed without a cloud on their title. BNX argues that had there been additional time to fairly market the assets, another bidder would have come forward and the final bid would have been even higher. CitiBank may well have still prevailed, but its final bid may have been higher because of the interest of an additional bidder. It, therefore, looks for another way to determine what the assets would have been sold for had there been no interference. It points to the fair market value of the intellectual property that was for sale and the valuation of between $4 and $6 million, which is the cost to reproduce the intellectual property from scratch. Nardolilli, in his communications to third parties, also adopted this range as the cost to reproduce the IP. He also put the fair market value of the IP at $35 to $50 million.

While the court agrees that the fair market value was in excess of $2.2 million, the court is unable to place any value higher than the final bid price. BNX did not adequately show that there would have been a higher bid had there been a longer marketing time with no cloud on the title, that is, when clear title was being offered to market place.

Moreover, an auction is a different market than a privately negotiated sale. Here, the auction represents a distressed sale. BNX was running out of money. It entered into bankruptcy with the expectation of being able to operate for no more than sixty days. Part of Nardolilli's scheme was to run the clock out on BNX so that the bankruptcy would fail and he could obtain the IP from a

Chapter 7 trustee for a very cheap price. Thus, the seller, BNX, is motivated differently in this auction sale than had it been outside bankruptcy with an unlimited marketing time. This affects price. There is insufficient credible evidence to permit the court to find that the final bid price offered by CitiBank in the auction after title had been cleared was lower because of Nardolilli's misconduct than had Nardolilli not interfered the process.

In addition to damages resulting from an inadequate sales price, BNX is entitled to recover attorneys' fees incurred to resist Nardolilli's false claims and the costs of operating BNX for the additional weeks while the claims were being resolved and the auction finally held. Those attorneys' fees were required to cure the problem wrongfully created by Nardolilli. The attorneys' fees incurred by BNX to prosecute this suit were not incurred to cure the problem Nardolilli created, but to recover damages resulting from it. As such, they are subject to the American rule which is that every party bears his own attorneys' fees absent one of the exceptions to the rule. The recoverable attorneys' fees and delay costs are $98,329.00 and $125,628.00, respectively.

Finally, there is the issue of punitive damages. Punitive damages lie here. Nardolilli's misconduct was willful. He improperly interfered with the rights of BNX by abusing the process of this court. He knew what he was doing and intended to injure BNX. He intended to prevent it from obtaining the best price possible and to impose additional expenses on BNX. He sought to prematurely terminate the Chapter 11 process by illegitimately causing BNX to run out of money. The public must be confident that auctions held by bankruptcy courts are full, fair, and honest. Debtors are entitled to an untainted auction process. Unless the public—which includes prospective purchasers—and debtors are satisfied as to the legitimacy of the court's auction process, auctions will have markedly less favorable results which hurts debtors and their creditors. It is necessary to

deter others who may think that it is to their advantage to improperly interfere with a bankruptcy auction.

The court believes that punitive damages in the amount of $100,000.00 are appropriate. This amount is proportional to the damages actually caused, even though only a fraction of what they would have been had Nardolilli been successful. It also appears to be generally consistent with Nardolilli's personal financial circumstances. While those circumstances are not entirely clear, some parameters are visible. He filed a voluntary petition in bankruptcy under Chapter 13. The bona fides of this filing is questionable. It was filed just before the close of business on the last business day before the trial in this case was to commence. The petition was handwritten, and Nardolilli's name, both his first and last, was misspelled five out of six times. The one time that it was typed, it was also misspelled. The petition was a bare bones petition, listing BNX as Nardolilli's sole creditor. The petition did not contain much information, but Nardolilli estimated that his liabilities are between $1 and $10 million and his assets are $1 million. In light of the manual misspelling of Nardolilli's signature on the petition that he manually signed himself, the court cannot give much weight to marking off particular boxes as to his assets and liabilities but they were choices made by Nardolilli himself. The court is satisfied that the information provided is enough to give a general view of Nardolilli's financial circumstances and will award punitive damages in the amount of $100,000.00.

Alexandria, Virginia
September 24, 2007

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Kevin M. O'Donnell
Joseph F. Jackson

13667-1